UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
KEITH KNEE,

                Plaintiff,                              Docket No.: 24-CV-2876

      -against-                                    **COMPLAINT**

CHICKEN SOUP FOR THE SOUL
ENTERTAINMENT, INC.,                              Jury Trial Demanded

                Defendants.
------------------------------------------------------------------------X

    Plaintiff, KEITH KNEE, by and through his attorneys, RICOTTA & MARKS, P.C., complaining of Defendants herein, alleges, upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

1. This court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest, fees, and costs.

2. This Court has personal jurisdiction over Defendant because it conducts substantial commercial activity in New York State, and the events giving rise to the dispute took place in New York.

1

3. Venue is proper in the Southern District of New York because the acts and/or omissions giving rise to the claims herein took place in this District. (Venue is proper pursuant to 28 U.S.C. § 1391.)

## PARTIES

4. At all relevant times mentioned, Plaintiff Keith Knee ("Knee") was a resident of the County of New York, State of New York during the applicable time period referenced below.

5. Defendant, Chicken Soup for The Soul Entertainment, Inc. ("CSSE"), was and still is a limited liability company located at 132 E. Putnam Ave., Fl 2, Cos Cob, CT 06807.

## FACTS

6. Knee provides advisory and consulting services to corporate executives, specializing in corporate development and strategic initiatives for large corporations, including business combinations between deep media, digital media, and entertainment media companies.

7. Knee's expertise includes revenue generation, distribution, intellectual property, and entertainment asset management.

8. In or around November 2019, Knee was introduced to Defendant's CEO and Chairman William "Bill" J. Rouhana ("Rouhana") due to Knee's deep media, digital media, and

entertainment media industry expertise, for the purpose of identifying strategic business partnerships and targets for strategic acquisitions.

9. Indeed, CSSE is a media company, popularly known for originally publishing a series of books called, "Chicken Soup for the Soul," but which has since expanded into other entertainment media areas.

10. For example, through acquisitions, CSSE owns Halcyon Studios, LLC, formerly known as Sonar Entertainment.

11. Acknowledging Knee's value to CSSE, Rouhana asked Knee to evaluate potential strategic business partnerships in the entertainment media industry.

12. Knee agreed, and immediately began advising Rouhana and CSSE on a number of potential strategic business partnerships in the entertainment media industry.

13. Knee worked closely with Rouhana between November 2019 and September 2020.

14. In late 2019, Plaintiff provided consulting services to CSSE in connection with CSSE's interest in acquiring a large entertainment media company, owned by one of the largest companies in the world.

15. During this time Rouhana, relied heavily on Knee's expertise in developing a strategy for this potential transaction.

16. Plaintiff and Defendant agreed that Plaintiff would be compensated for his services in the event that CSSE entered into a joint venture, acquisition, or other transaction with the media company.

17. Ultimately, CSSE did not enter into a transaction with this particular media company.

18. In or around March 2020, Rouhana asked Plaintiff to provide consulting services to CSSE in connection with a strategic business transaction between Redbox Automated Retail LLC ("Redbox Automated") and CSSE (the "Redbox Project").

19. Knee again agreed, and began providing consulting services to CSSE relating to the Redbox Project, forgoing other lucrative business opportunities to devote his services instead to CSSE.

20. Redbox Automated (now Redbox Entertainment, Inc., collectively "Redbox")[1] was a video-on-demand streaming and video rental company specializing in DVD, Blu-ray, and 4K UHD rentals from kiosks located at retail store locations throughout the country.

---

[1] In 2021, Redbox Automated was subject to a Special Acquisition Company ("SPAC"), and subsequent initial public offering ("IPO", collectively with the SPAC, the "SPAC/IPO". Redbox Entertainment, Inc. ("Redbox Ent.") was the resulting public entity. Redbox Ent. is comprised of the same assets, operations, and lines of business as Redbox Automated.

4

21. Redbox also maintained additional lines of business including Transactional Video on Demand ("TVOD") services, Advertising-based Video-on-Demand ("AVOD") services, a kiosk servicing business and a studio to produce its own content.

22. On the Redbox Project, Knee worked directly with Rouhana and Galen Smith, Redbox's CEO.

23. In other words, Knee worked directly and intimately with the highest-level decision makers of both corporations.

24. On or about April 2, 2020, Knee sent Rouhana an overview of the potential transaction with Redbox.

25. The following day, CSSE sent Knee's overview almost verbatim to Redbox.

26. Rouhana relied on Plaintiff and his expertise, as they jointly developed a strategy for a partnership between Redbox and CSSE.

27. Knee assisted Rouhana in preparing for and participating in an April 9, 2020, telephone conference with Smith to discuss the high-level parameters of a potential transaction.

28. On or about April 15, 2020, Rouhana told Knee that he did not want to pay a retainer for Knee's services, but instead proposed a fee payable upon the success of the transaction.

29. Specifically, Rouhana stated, "I really appreciate the help you are giving us and we can pay success fees on deals we get done with you, but this is not a time where we can take on fixed consulting costs . . .."

30. Per Rouhana's instructions and understanding that his work would not go uncompensated, Knee analyzed and provided strategic advice to CSSE concerning the integration of Redbox's lines of business to complement CSSE's overall business strategy by providing operational and financial scale, increasing cash flow, and enhancing CSSE's corporate rate of return.

31. Plaintiff had numerous discussions with Rouhana, explaining the potential benefits of CSSE's acquisition of Redbox, including the following:
    i. Plaintiff's analysis of the value and potential alternative uses for Redbox's 38,000 kiosks at retail store locations across the country;
    ii. CSSE's ability to leverage Redbox's data concerning consumer viewing habits and rental history for 40 million Redbox users, including but not

       limited to data across all film and television production studios for the past 18 years;

  iii.  CSSE's ability to incorporate Redbox's consumer loyalty program data in combination with CSSE's data compilations to target customers more effectively;

  iv.  CSSE's potential ability to use Redbox's beacon technology concerning digital in- car and retail store digital networks;

  v.  CSSE's potential use and expansion of Redbox's digital toppers for digital out-of- home ("DOOH") advertising to promote CSSE and Redbox products and/or generate outside advertising and marketing revenue;

  vi.  CSSE's potential use and expansion of Redbox's infrastructure for emerging TVOD, AVOD, and Premium Video on Demand ("PVOD") services;

  vii.  Analysis of Redbox's original content in development;

  viii.  CSSE's potential use and expansion of Redbox's developing original content;

  ix.  Analysis of Redbox's emerging digital streaming business; and

  x.  CSSE's potential ability to leverage or spinoff Redbox's kiosk servicing business.

32.  In or around April 2020, Rouhana charged Plaintiff with conducting due diligence on Redbox and reporting his findings back to Rouhana.

7

33. At such time, Plaintiff executed a non-disclosure agreement in connection with a potential transaction between CSSE and Redbox.

34. Knee ran all due diligence between Redbox and CSSE until August 2020.

35. CSSE personnel did not participate in any due diligence at that time.

36. Knee continued to participate in the due diligence process relating to the Redbox Project for a period of time after CSSE personnel and CSSE's financial advisor became involved.

37. Knee continued to report directly to Rouhana.

38. Knee spent numerous hours interfacing directly with Redbox executives, including Redbox's Chief Financial Officer, Chief Executive Officer, Chief Digital Officer, and other high-level personnel.

39. In connection with that due diligence, Plaintiff analyzed the position of Redbox in the market, including Redbox's position with respect to its DVD, Blu Ray, and video game rental business, and its emerging digital streaming business, DOOH advertising

business, kiosk business and kiosk servicing business.

40. Knee's due diligence analysis, based on both public and private Redbox data, considered numerous factors, including the following:

   i. demographics and viewing pattern information for Redbox's subscriber base, and subscriber perks program members;

   ii. status of Redbox's distribution deals and contracts with movie studios and content providers;

   iii. status of Redbox's relationships with retail businesses hosting its kiosks;

   iv. Redbox's content strategy in light of the COVID-19 pandemic;

   v. status of Redbox's production of original content;

   vi. Redbox's kiosk revenue on a state-by-state basis;

   vii. The technology behind Redbox's beacon network;

   viii. Redbox's strategy for AVOD services;

   ix. Redbox digital out of home advertising

   x. The uses for which Redbox's kiosks could be repurposed and refitted, and

   xi. some general financial issues including capital expenditures, dividends schedules, debt and revenue and EBITDA forecasts; and

   xii. Redbox's growth strategy.

41. These services furthered CSSE's goals of determining the value of Redbox to CSSE for the purpose of formulating a bid.

42. In or around August 2020, as evidence that Knee's work had persuaded CSSE to take its pursuit of Redbox to the next level, CSSE engaged Guggenheim Securities, LLC to serve as its financial advisor on the transaction.

43. At that point, Guggenheim handled the remaining financial due diligence relating to the Merger.

44. CSSE and Guggenheim relied heavily on Knee's due diligence in connection with CSSE's subsequent acquisition of Redbox.

45. CSSE continued to utilize Plaintiff's services consulting on an as-needed basis.

46. In November 2020, CSSE and Redbox executed a non-binding term sheet for a potential business combination.

47. However, no final agreement was reached between the parties at that time.

48. By the end of 2020, of the available options for a deal as between Redbox and CSSE, the only strategic transaction being considered by Rouhana was an outright acquisition of Redbox by CSSE.

49. In or around early 2021, Rouhana continued to communicate with Knee concerning the Redbox Project and Knee's compensation for his services.

50. Rouhana told Knee that he wanted to finalize his and Guggenheim's compensation so that he could determine the all-in cost of an acquisition of Redbox.

51. Thus, Rouhana reaffirmed CSSE's commitment to compensating Knee.

52. Based on Rouhana's representations, Plaintiff Knee continued to make himself available to CSSE on the Redbox Project, forgoing other business opportunities.

53. In or around May 2021, Redbox proceeded with the SPAC/IPO rather than pursuing a transaction with CSSE.

54. Rouhana told Knee that the SPAC/IPO would be detrimental to Redbox's stock price.

55. Rouhana predicted that CSSE could then purchase the distressed Redbox at a

significantly lower price after the SPAC predictably failed to produce the results Redbox anticipated.

56. In other words, though the mechanism by which CSSE pursued Redbox was not necessarily as originally contemplated, it was apparent that CSSE was convinced that it wanted to acquire Redbox.

57. Rouhana reassured Knee, that Knee would be compensated for his work should a merger occur with the reorganized Redbox even after the SPAC/IPO.

58. In a subsequent conversation with Knee, Elana Sofka ("Sofka"), CSSE's Chief Strategic Officer, further confirmed that CSSE's plan was merely waiting for Redbox to implode.

59. Sofka told Knee, "Bill [Rouhana] looked at me and said, we are going to wait around by the net because that SPAC is going to implode, and they are going to be back, and we are going to be able to get this company for two-thirds of what they are asking for right now."

60. In or around February 2022, as Rouhana and Knee had previously discussed,

negotiations for an acquisition between CSSE and the reorganized Redbox resumed after the SPAC/IPO was completed, this time at a substantially lower price for essentially the same assets.

61. The Merger was valued at $375 million.

62. In an article published May 11, 2022, Redbox and CSSE issued a joint press release announcing the Merger.

63. In a Forbes online article dated the same day, Rouhana touted many of the Merger benefits previously identified by Knee.

64. Specifically, Rouhana stated in the public record:

> I'm buying the dinosaur because the dinosaur comes with cash flow and the dinosaur is gonna lay nice little dinosaur eggs called digital ad businesses with 40 million customers who already love the brand, with its TVOD (transactional video on demand) business and free TV business already in place … We're gonna create a very important platform in the entertainment business, where we reach consumers in probably the most ways of anybody. At the kiosk, in TVOD,

13

in AVOD and in our loyalty program. I don't think this is a dinosaur. I think this is the future.

65. Rouhana's praise for the value of Redbox's assets parroted the benefits explained to him by Knee in connection with his services to CSSE.

66. On or about May 17, 2022, a week after the merger was made public, Sofka spoke with Knee about the Merger.

67. Sofka acknowledged to Plaintiff that the Merger could not have come together as it did without Knee's contributions.

68. During this conversation, Sofka repeatedly confirmed to Knee that CSSE would compensate Knee for his work in connection with the Merger.

69. On or about August 5, 2022, before the close of the Merger, Plaintiff, through his attorney at the time, sent an intent to sue and demand letter to CSSE.

70. In sum and substance, this August 5th letter set forth much of the foregoing

14

allegations, and alleged that CSSE was liable to Knee for at least several million dollars.

71. CSSE failed to respond to the demand letter.

72. On or about August 11, 2022, CSSE announced the completion of the Merger.

73. CSSE has continued to ignore ongoing requests by Knee and his counsel to discuss the compensation owed to him.

74. Plaintiff is seeking compensation for his other services rendered in connection with the Merger, as described above.

75. While a portion of Plaintiff's work consisted of introducing Defendant to Redbox principals and assisting in the negotiations of a potential transaction, Plaintiff is not seeking any compensation from Defendant for time spent on this work.

76. Plaintiff now seeks to recover damages against Defendant for those services performed at Defendant's request for which Plaintiff was not compensated.

## **AND AS FOR A FIRST CLAIM FOR RELIEF (Quantum Meruit)**

77. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

78. Between March to late 2020, Plaintiff performed services in connection with CSSE's acquisition of Redbox including, but not limited to, services related to advising CSSE on its decision to determine whether to engage in negotiations for the acquisition and with CSSE's formulation of a bid for Redbox.

79. These services were performed for and at the request of CSSE, which accepted these services and benefited from them.

80. As stated explicitly between the parties, on more than one occasion, there was an expectation that CSSE would compensate Knee for rendering these services.

81. Of the services provided by Plaintiff, a small portion consisted of intermediary work including negotiations and introductions of principals to the transaction.

82. CSSE has failed to provide any compensation to Knee or even negotiate directly with

16

Knee about its compensation for Knee's services.

83.  By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

**AND AS FOR A SECOND CLAIM FOR RELIEF (Unjust Enrichment)**

84.  Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

85.  In performing the services for CSSE, Knee utilized his many years of specialized industry experience, expended substantial time and effort, and gave up other business opportunities and revenue streams he could otherwise have pursued.

86.  In receiving the services described herein from Knee, CSSE benefitted greatly from Knee's specialized industry knowledge, his ability to identify synergies between CSSE and Redbox, and his ability to properly value Redbox's assets.

87.  It would be contrary to equity and good conscience to permit CSSE to retain the fair and reasonable value of the services performed by Knee, after having used those services for a successful acquisition of Redbox.

88. CSSE has failed to provide any compensation to Knee or even negotiate directly with Knee about its compensation for Knee's services.

89. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

**AND AS FOR A THIRD CLAIM FOR RELIEF (Promissory Estoppel)**

90. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

91. Defendant made clear and unambiguous promises of payment to Plaintiff for his services in connection with Defendant's business combination with Redbox.

92. Plaintiff reasonably relied on Defendant's promises.

93. Plaintiff suffered injury as a result of his reliance on Defendant's promises, to wit, lost business opportunities.

94. In performing the services for CSSE, Knee utilized his many years of specialized industry experience, expended substantial time and effort, and gave up other business opportunities and revenue streams he could otherwise have pursued.

95. In receiving the services described herein from Knee, CSSE benefitted greatly from Knee's specialized industry knowledge, his ability to identify synergies between CSSE and Redbox, and his ability to properly value Redbox's assets.

96. It would be contrary to equity and good conscience to permit CSSE to retain the fair and reasonable value of the services performed by Knee, after having used those services for a successful acquisition of Redbox.

97. CSSE has failed to provide any compensation to Knee or even negotiate directly with Knee about its compensation for Knee's services.

98. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. On its FIRST Claim for Relief, awarding Plaintiff compensatory damages against Defendant in an amount to be determined at trial;

B. On its SECOND Claim for Relief, awarding Plaintiff compensatory damages against Defendant in an amount to be determined at trial;

C. On its THIRD Claim for Relief, awarding Plaintiff compensatory damages against Defendant in an amount to be determined at trial;

    D.      Punitive damages (where applicable);

    E.      Awarding Plaintiff his costs, interest, and attorneys' fees of this action;

    F.      Granting Plaintiff such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

WHEREFORE, Plaintiff demands judgment against Defendants for all compensatory damages, and any other damages permitted by law. It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled. Plaintiff demands a trial by jury.

Dated: Seaford, New York
April 15, 2024

RICOTTA & MARKS, P.C.
*Attorneys for Plaintiff*
2174 Jackson Ave.
Seaford, New York 11783
(347) 464-8694

_____/s_____
MATTHEW MARKS, ESQ.